KEARNEY & SCHWEITZER
NANCY HART-ESPOSITO (NH2537)
210 White Horse Pike
P.O. Box 279
Haddon Heights, NJ 08035
Telephone: 856/547-7733
Facsimile: 856/546-5154

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
KELLY M. MCINTYRE
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile:  619/525-3991

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BYRON E. CROWLEY, Derivatively On Behalf of BED BATH & BEYOND INC., | ) ) ) |
| Plaintiff, | ) <u>DERIVATIVE ACTION</u> ) ) |
| vs. | ) ) |
| STEVEN H. TEMARES, WARREN EISENBERG, LEONARD FEINSTEIN, MATTHEW FIORILLI, ARTHUR STARK, RONALD CURWIN, EUGENE A. CASTAGNA, ALLAN N. RAUCH, ROBERT S. KAPLAN, KLAUS EPPLER, DEAN S. ADLER, VICTORIA A. MORRISON, STANLEY F. BARSHAY, JORDAN HELLER, FRAN S. STOLLER, RICHARD D. FALCONE, AND CHRISTOPHER P. FORESTER, | ) Civil Action No. ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants | ) ) |
| -and- | ) ) |
| BED BATH & BEYOND INC, a New York corporation, | ) ) ) |
| Nominal Defendant. | ) ) |
| | ) <u>JURY TRIAL DEMAND</u> |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE SARBANES OXLEY ACT OF 2002, SECTIONS 10(B) AND 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, ACCOUNTING, RESCISSION AND FOR A CONSTRUCTIVE TRUST**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.       This is a shareholder derivative action brought by shareholders of Bed Bath & Beyond Inc. ("BBB" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including violations of the Securities Exchange Act of 1934 ("Exchange Act"), violations of the Sarbanes-Oxley Act of 2002 ("SOX"), breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that have caused substantial losses to BBB and other damages, such as to its reputation and goodwill.  On behalf of BBB, this action seeks, among other things, damages, corporate governance reforms, an accounting, rescission, restitution and the declaration of a constructive trust to remedy defendants' violations of state law.

### Defendants' Illegal Backdating Practices

2.       Dating back to at least 1993, defendants have caused or allowed BBB insiders to manipulate their stock-option grant dates so as to secretly maximize their profits from the stock options.  Specifically, certain BBB insiders changed their respective stock-option grant dates to take advantage of lower exercise prices than the price on the actual grant date.  The price of BBB shares on the reported option-grant date therefore was lower than the share price on the actual day options were issued.  Thus, the backdating of these stock options brought BBB insiders an instant paper gain.  By engaging in this scheme, defendants were able to conceal from investors that the Company was not recording material compensation expenses and materially overstating BBB's net income and earnings per share. By 2006, these defendants have allowed themselves and others the ability to sell over $1.1 billion worth of BBB stock and realize over a billion dollars in illicit compensation through the exercise of backdated option grants and subsequent sale of BBB stock.

3.      The traditional rationale behind the granting of stock options is to align a company's officers, directors and employees with the interests of the company.  When an option is granted at or below full market value, that option is worthless until the grantee builds value in the option by building value in the company.  Thus, the company and the insider both share in the value created. The backdating of options, however, subverts this principle because the instant paper gain of a backdated stock option only benefits the insider.

4.      The granting of stock options to BBB insiders, at times relevant hereto, was controlled by four stock options plans: the BBB 1992 Stock Option Plan (the "1992 Plan"), BBB 1996 Stock Option Plan (the "1996 Plan"), BBB 1998 Stock Option Plan (the "1998 Plan") and the BBB 2000 Stock Option Plan (the "2000 Plan").  Defendants were required under federal law to present these plans to BBB's shareholders for approval.  Each of these plans contained restrictions on the exercise price of options granted under the plans.  Specifically, the 1992 Plan provides that "the exercise price per share of stock shall not be less than 100% … of the fair market value per share of Stock at the time the option is granted…."  The 1996 Plan, 1998 Plan and 2000 Plan each contain identical language as to exercise price.  Thus, defendants' backdating practices, which resulted in below-fair-market-value-option grants, violated the 1992 Plan, 1996 Plan, 1998 Plan and 2000 Plan. Further, defendants' backdating practices resulted in truncated stock-option vesting periods—a further violation of these plans.  In turn, because the plans were violated, the backdated options granted under these plans must be cancelled and declared void.

5.      The 1998 Plan and the Directors' Plan were administered by two Stock Option Committees and the Board of Directors (the "Board").  The 1992 Plan specifically spelled out this responsibility as follows: "[t]he Plan shall be administered by a committee … of two or more directors appointed from time to time by the Board."  Similarly, the 1996 Plan provides that "[t]he Plan shall be administered by one or more committees appointed from time to time by the Board…." The 1998 Plan and 2000 Plan contain identical language as to the administration of the plan. Accordingly, the Board and the two Stock Option Committees were directly responsible for the backdating and violations of the plans.

6. Further, defendants have caused or allowed BBB: (i) to file materially false and misleading financial statements that materially understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share; and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed BBB's options as having been granted at exercise prices equal to the fair market value of BBB's common stock on the date of the grant. Under Generally Accepted Accounting Principles ("GAAP"), the instant paper gain received from backdated stock options was equivalent to paying extra compensation and was thus a cost to BBB. These costs were also not properly recorded. In turn, since these costs were not properly recorded, BBB's profits were overstated. Thus, a restatement of BBB's past financial results will be necessary to correct for these improprieties.

7. In addition, the backdating of stock options can have severe tax consequences. While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment. In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants. For example, for performance-based stock options (generally granted to the five highest-paid executives) a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*. Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives. In September 2006, in response to these types of tax implications, the Internal Revenue Service ("IRS") placed criminal investigators on an options-backdating task force formed by the U.S. Attorney for the Northern District of California. That task force also includes the Federal Bureau of Investigation ("FBI").

**The "Outrageous" Backdating Scandal**

8. The backdating scandal is outrageous as evidenced by the following commentary: Lynn Turner, former Chief Accountant of the U.S. Securities and Exchange Commission ("SEC"), has described stock option backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line ..." In a recent article published by *The Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock-option

backdating "represents the ultimate in greed." Further, Levitt stated: "It is stealing, in effect. It is ripping off shareholders in an unconscionable way." San Diego analyst Michael Cohen later made similar comments published by Bloomberg: "Stockholders are hit twice … first you're stolen from, then the stock goes down when the theft is uncovered." Senator Chuck Grassley, Chairman of the Senate Finance Committee, concurs. He referred to stock-option backdating as "disgusting and repulsive." Grassley stated: "It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' Even worse in this situation, most of the perpetrators had already gotten 'theirs' in the form of six and seven-figure compensation packages of which most working Americans can only dream."

9.     On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

10.     On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock-option grant dates. Criminal charges were brought simultaneously, indicating the serious view taken by governmental agencies with respect to improperly backdated options.

11.     In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that "the full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating." He disclosed that additional cases likely would be brought in the "coming weeks and months." In later testimony before a Senate committee, Cox indicated that the SEC is currently investigating more than 100 companies, a large percentage of which are tech companies, meaning many more executives could face criminal charges related to manipulating options.

12.     Government disgust at stock-option backdating reached a new level on July 31, 2006, when the FBI issued an arrest warrant for Kobi Alexander ("Alexander")—former Chief Executive Officer ("CEO") of Comverse Technology, Inc. ("Comverse"). Alexander is charged with conspiracy related to backdated stock options. Alexander was considered a fugitive by the U.S.

Government and had transferred more than $57 million from the U.S. to an account in Israel to conceal funds from the government. On September 27, 2006, police in Namibia, a country in southern Africa, arrested Alexander.

### Backdating Disclosures at BBB and Resulting Damages

13.     On June 19, 2006, in reaction to analyst reports that identified suspicious option grants at BBB, the Company initiated an internal investigation of its stock option grant practices from 1992 to May 15, 2006. On September 20, 2006, BBB learned that the SEC was commencing its own inquiry into the Company's stock-option backdating practices.

14.     One day later, on September 21, 2006, defendants, for the first time, disclosed the SEC and internal investigations.

15.     On October 10, 2006, BBB issued a Form 8-K disclosing the findings of the internal investigation. Importantly, the investigation uncovered "various deficiencies in the process of granting and documenting stock options and restricted shares." Further, the Company concluded that: (i) "hindsight was used in selecting some annual grant dates"; (ii) "[t]he option granting process had control and other deficiencies"; and (iii) "[t]he Company failed to maintain adequate controls with respect to issuance of options in compliance with the Company's stock option policies; the Company's polices were also not sufficient to ensure compliance with all applicable accounting rules."

16.     In total, the investigation found 16 annual, 26 monthly and 2 special grant dates in which defendants used improper measurement dates. To correct for the accounting of these stock options, defendants have opted to record a $66 million reclassification on the equity section of the Company's consolidated balance sheet to be included in BBB's FY:07 Form 10-K. Further, the Company will record an $8 million charge on its consolidated statement of earnings to be included in BBB's 3Q:06 Form 10-Q.

17.     Defendants' accounting treatment of over $74 million of improperly accounted for stock option expenses is dependent on their conclusion that these errors are immaterial. Defendants' materiality opinion, however, will likely not be shared by the SEC. The SEC and applicable accounting rules dictate that issues related to the integrity of management are always material.

Defendants' participation in a scheme to backdate options and pay themselves secret paper profits definitely speaks to their integrity.

18.     Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *In re TSC Industries*, 426 U.S. 438, 449 (1976) and in SEC Staff Accounting Bulletin No. 99 ("SAB 99"), released August 12, 1999. The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available."  426 U.S. at 449.  SAB 99 further explains that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.

19.     SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone. Qualitative factors that can make a misstated fact material include, among others:

(a)     whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)     whether the misstatement arises from an item "capable of precise measurement";

(c)     whether the misstatement masks a change in earnings;

(d)     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)     whether the misstatement affects the registrant's compliance with regulatory requirements.

20.     The improper backdating of stock options is material under each criterion above individually, and is material under all of the criteria collectively.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about BBB. That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's. As the SEC ruled in the administrative case *In re Franchard Corp.*, the

integrity of a company's management "is always a material factor." 42 S.E.C. 163 (1964). Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation. Third, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured. Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses. Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability. Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses. Thus, defendants' illegal stock-option backdating practices are material under these qualitative factors.

21.     Moreover, under applicable accounting rules, a financial misstatement that appears immaterial as to a single reporting period can have a cumulative material impact on other periods. In such a situation, the misstatement must be corrected, according to SEC Staff Accounting Bulletin No. 108 ("SAB 108"). Although SAB 108 is dated September 13, 2006, it draws on years of prior accounting literature and practice that defendants must take into account in correcting BBB's financials. Thus, defendants can not hide the materiality of their backdating practices by spreading the errors related to those practices over several financial periods and can not claim that "charges are not material to [BBB's] financial statements in any of the periods in which such charges would have been related…."

22.     Thus, under applicable SEC and accounting rules and pronouncements, BBB will likely be required to file a restatement to correct for the $74 million in improperly accounted for stock option expenses. Defendants can not hide those errors in reclassifications and expense charges.

23.     Plaintiff's own investigation of BBB's prior option grants has revealed several option grants that were blatantly dated at the lowest share price for the period in which they were granted. Further, these suspicious grants span from at least 1996 until 2002. During this time, certain of the defendants engaged in excessive amounts of insider sales. Accordingly, this action is necessary to

end these option-backdating practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

24.     As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     costs incurred from responding to potential subpoenas and requests for information from government agencies including the SEC;

(c)     costs incurred from potential fines in connection with governmental investigations;

(d)     costs incurred from increased Directors and Officer's Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)     enormous tax liabilities from improper deductions taken on backdated option grants;

(f)     costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(g)     costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(h)     costs incurred from directing manpower to correct BBB's defective internal controls; and

(i)     costs incurred from directing manpower to potentially restate BBB's prior financial results to correct for the improperly dated stock option grants.

25.     A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 8%.  A similar 8% fall in BBB's market value would result in a decline of over $904 million.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the SOX and Exchange Act.

27.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in the Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to BBB occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

29.     Plaintiff Byron E. Crowley is, and was at times relevant hereto, an owner and holder of BBB common stock.  Plaintiff is a citizen of North Carolina.

30.     Nominal defendant BBB is a New York corporation with its principal executive offices located at 650 Liberty Avenue, Union, New Jersey.  BBB operates as a national chain of retail stores that sell domestic merchandise including bed linens, bath items, kitchen textiles, home furnishings and other housewares.

31.     Defendant Steven H. Temares ("Temares") is BBB's CEO and has been since 2003. Temares is also a BBB director and has been since January 1999. Temares was BBB's President from 1999 to January 2006; Chief Operating Officer from 1997 to 2003; Executive Vice President from 1997 to 1999; and Director of Real Estate and General Counsel from 1992 to 1997.  Because of Temares' positions, defendant Temares knew, consciously disregarded, was reckless and grossly

negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  Temares received at least 1,325,000 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases.  Accordingly, on information and belief, plaintiff alleges that Temares backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders.  BBB paid Temares the following compensation:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|
| Temares | 2005 | $1,131,000 | $2,400,002 | 200,000 |
| | 2004 | $1,031,000 | - | 300,000 |
| | 2003 | $931,000 | - | 400,000 |
| | 2002 | $833,000 | - | 300,000 |
| | 2001 | $733,000 | - | 300,000 |
| | 2000 | $633,000 | - | 300,000 |
| | 1999 | $525,000 | - | 200,000 |
| | 1998 | $383,000 | - | 100,000 |
| | 1997 | $292,000 | - | 100,000 |
| | 1996 | $199,000 | - | 25,000 |
| | 1995 | $166,000 | - | 60,000 |
| | 1994 | $142,000 | - | 40,000 |

Defendant Temares sold 1,207,000 of his personally held shares for $40,311,590 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Defendant Temares is a citizen of New Jersey.

32.     Defendant Warren Eisenberg ("Eisenberg") is a BBB Co-Chairman and has been since 1999.  Eisenberg is also a BBB director and has been since 1971.  Eisenberg was BBB's Co-CEO from 1971 to April 2003; Chairman from 1992 to 1999; and President from 1971 to 1992.  Eisenberg is a co-founder of BBB.  Because of Eisenberg's positions, defendant Eisenberg knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to her in connection therewith. Eisenberg received at least 1,800,000 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Eisenberg backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders. BBB paid Eisenberg the following compensation:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Eisenberg | 2005 | $1,100,000 | $2,400,002 | 100,000 | - |
| | 2004 | $1,081,000 | - | 300,000 | $71,744 |
| | 2003 | $981,000 | - | 400,000 | $61,749 |
| | 2002 | $883,000 | - | 300,000 | $253,721 |
| | 2001 | $792,000 | - | 300,000 | $343,942 |
| | 2000 | $750,000 | - | 300,000 | - |
| | 1999 | $750,000 | - | 400,000 | $321,468 |
| | 1998 | $750,000 | - | - | $318,439 |
| | 1997 | $750,000 | - | 500,000 | $317,758 |
| | 1996 | $750,000 | - | - | $319,574 |
| | 1995 | $750,000 | - | - | $323,456 |
| | 1994 | $750,000 | - | - | $241,851 |
| | 1993 | $750,000 | - | - | $75,000 |

Defendant Eisenberg sold 15,081,523 of his personally held shares for $535,470,055.07 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Defendant Eisenberg is a citizen of New Jersey.

33.     Defendant Leonard Feinstein ("Feinstein") is a BBB Co-Chairman and has been since 1999. Feinstein is also a BBB director and has been since 1971. Feinstein was BBB's Co-CEO from 1971 to April 2003; President from 1992 to 1999; and Treasurer, and Secretary from 1971 to 1992. Feinstein is a co-founder of BBB. Because of Feinstein's positions, defendant Feinstein knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees

thereof and via reports and other information provided to her in connection therewith.  Feinstein received at least 1,800,000 options that were purportedly dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Feinstein backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders. BBB paid Feinstein the following compensation:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------------------------|-------------------------------|------------------------|
| Feinstein | 2005 | $1,100,000 | $2,400,002 | 100,000 | - |
|           | 2004 | $1,081,000 | - | 300,000 | $60,133 |
|           | 2003 | $981,000 | - | 400,000 | $60,602 |
|           | 2002 | $883,000 | - | 300,000 | $221,898 |
|           | 2001 | $792,000 | - | 300,000 | $281,291 |
|           | 2000 | $750,000 | - | 300,000 | $275,752 |
|           | 1999 | $750,000 | - | 400,000 | $271,972 |
|           | 1998 | $750,000 | - | - | $261,050 |
|           | 1997 | $750,000 | - | 500,000 | $258,381 |
|           | 1996 | $750,000 | - | - | $258,828 |
|           | 1995 | $750,000 | - | - | $260,055 |
|           | 1994 | $750,000 | - | - | $209,295 |
|           | 1993 | $750,000 | - | - | $60,000 |

Defendant Feinstein sold 14,293,791 of his personally held shares for $515,533,132.32 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Defendant Feinstein is a citizen of Florida.

34.     Defendant Matthew Fiorilli ("Fiorilli") is BBB's Senior Vice President – Stores and has been since January 1999.  Fiorilli was also Vice President – Stores from 1998 to 1999 and Director of Store Operations – Eastern Region from 1994 to 1998.  Because of Fiorilli's positions, defendant Fiorilli knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Fiorilli received at least 315,000 options that were dated at or very close to the lowest stock price for the month during which

options were granted. Accordingly, on information and belief, plaintiff alleges that Fiorilli backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders. BBB paid Fiorilli the following compensation:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options |
|---|---|---|---|---|
| Fiorilli | 2005 | $686,000 | $600,010 | 25,000 |
| | 2004 | $613,000 | - | 100,000 |
| | 2003 | $548,000 | - | 100,000 |
| | 2002 | $490,000 | - | 75,000 |
| | 2001 | $432,000 | - | 75,000 |
| | 2000 | $382,000 | - | 75,000 |
| | 1999 | $340,000 | - | 50,000 |
| | 1998 | $294,000 | - | 40,000 |
| | 1997 | $251,000 | - | 25,000 |
| | 1996 | $226,000 | - | 25,000 |

Defendant Fiorilli sold 667,000 of his personally held shares for $20,242,950 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Defendant Fiorilli is a citizen of New Jersey.

35.     Defendant Arthur Stark ("Stark") is BBB's President and has been since January 2006. Stark is also BBB's Chief Merchandising Officer and has been since 1999. Stark was BBB's Senior Vice President from 1999 to 2006; Vice President – Merchandising from 1998 to 1999; and Director of Store Operations – Western Region from 1997 to 1998. Because of Stark's positions, defendant Stark knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Stark received at least 315,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Stark backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders. BBB paid Stark the following compensation:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options |
|-----------|-------------|--------|------------------------|-------------------------------|
| Stark | 2005 | $686,000 | $600,010 | 25,000 |
| | 2004 | $613,000 | - | 100,000 |
| | 2003 | $548,000 | - | 100,000 |
| | 2002 | $492,000 | - | 75,000 |
| | 2001 | $442,000 | - | 75,000 |
| | 2000 | $392,000 | - | 75,000 |
| | 1999 | $350,000 | - | 50,000 |
| | 1998 | $304,000 | - | 40,000 |
| | 1997 | $256,000 | - | 25,000 |
| | 1996 | $232,000 | - | 25,000 |

Defendant Stark sold 712,000 of his personally held shares for $19,757,020 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Defendant Stark is a citizen of New Jersey.

36.  Defendant Ronald Curwin ("Curwin") is BBB's Senior Vice President of Investor Relations and has been since January 2006.  Curwin was BBB's Chief Financial Officer ("CFO") and Treasurer from 1994 to January 2006.  Because of Curwin's positions, defendant Curwin knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Curwin received at least 40,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiff alleges that Curwin backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders.  BBB paid Curwin the following compensation:

| Defendant | Fiscal Year | Salary | Securities Underlying Options |
|-----------|-------------|--------|-------------------------------|
| Curwin | 1997 | $130,000 | 10,000 |
| | 1996 | $121,000 | 10,000 |
| | 1995 | $121,000 | - |
| | 1994 | $35,442 | 50,000 |

Defendant Curwin sold 199,000 of his personally held shares for $6,331,230 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Defendant Curwin is a citizen of New Jersey.

37. Defendant Eugene A. Castagna ("Castagna") is BBB's CFO and Treasurer and has been since January 2006. Castagna was Assistant Treasurer from 2002 to January 2006; Vice President – Finance and Principal Financial Officer from 2001 to January 2006; Principal Accounting Officer from 2000 to January 2006; and Vice President – Controller from 1994 to 2001. Because of Castagna's positions, defendant Castagna knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Castagna received at least 115,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiff alleges that Castagna backdated these stock options and received illegal compensation from BBB that was not disclosed to the Company's shareholders. Defendant Castagna sold 140,400 of his personally held shares for $5,525,048 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Defendant Castagna is a citizen of New Jersey.

38. Defendant Allan N. Rauch ("Rauch") is BBB's Vice President – Legal and General Counsel and has been since 1997. Because of Rauch's position, defendant Rauch knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Rauch is a citizen of New Jersey.

39. Defendant Robert S. Kaplan ("Kaplan") is a BBB director and has been since 1994. Because of Kaplan's position, defendant Kaplan knew, consciously disregarded, was reckless and

grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Defendant Kaplan sold 214,196 of his personally held shares for $7,373,790.80 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Defendant Kaplan is a citizen of New York.

40. Defendant Klaus Eppler ("Eppler") is a BBB director and has been since 1992. Because of Eppler's position, defendant Eppler knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Defendant Eppler is a citizen of Florida.

41. Defendant Dean S. Adler ("Adler") is a BBB director and has been since 2001. Because of Adler's position, defendant Adler knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Defendant Adler is a citizen of Pennsylvania.

42. Defendant Victoria A. Morrison ("Morrison") is a BBB director and has been since 2001. Because of Morrison's position, defendant Morrison knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to her in connection therewith. Defendant Morrison is a citizen of New Jersey.

43.      Defendant Stanley F. Barshay ("Barshay") is a BBB director and has been since 2003. Because of Barshay's position, defendant Barshay knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Defendant Barshay is a citizen of New York.

44.      Defendant Jordan Heller ("Heller") is a BBB director and has been since 2003. Because of Heller's position, defendant Heller knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Defendant Heller is a citizen of New Jersey.

45.      Defendant Fran S. Stoller ("Stoller") is a BBB director and has been since 2003. Because of Stoller's position, defendant Stoller knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to her in connection therewith. Defendant Stoller is a citizen of New York.

46.      Defendant Richard D. Falcone ("Falcone") was BBB's CFO and Treasurer from 1992 to 1994.  Falcone was also BBB's Controller from 1990 to 1992.  Because of Falcone's positions, defendant Falcone knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and

via reports and other information provided to him in connection therewith. Defendant Falcone is a citizen of New Jersey.

47.     Defendant Christopher P. Forester ("Forester") was a BBB director from 1992 to 1994. Because of Forester's position, defendant Forester knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that BBB insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and via reports and other information provided to him in connection therewith. Defendant Forester is a citizen of New York.

48.     The defendants identified in ¶¶31-33, 39-45 and 47 are referred to herein as the "Director Defendants." The defendants identified in ¶¶31-38 and 46 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶31-37 and 39 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors and/or fiduciaries of BBB and because of their ability to control the business and corporate affairs of BBB, the Individual Defendants owed BBB and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage BBB in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BBB and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

50.     Each director and officer of the Company owes to BBB and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

compensation paid to its executives, directors and employees. These disclosures necessarily include the value of stock options granted to the Company's insiders.

51. The Individual Defendants, because of their positions of control and authority as directors and/or officers of BBB, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as the Company's disclosures of its financial results including expenses related to stock option grants. Because of their advisory, executive, managerial and directorial positions with BBB, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of BBB.

52. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BBB, and was at all times acting within the course and scope of such agency.

53. To discharge their duties, the officers and directors of BBB were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of BBB were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting the Company's assets;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to BBB's internal controls, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in

connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

      (e)    ensure that BBB was properly handling its tax liabilities;

      (f)    ensure that BBB's internal controls are sufficient to prevent backdating or other manipulations of stock options granted to BBB insiders; and

      (g)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

54. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BBB, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprise all of BBB's Board.

55. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such improper actions. As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

      (a)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

      (b)    costs incurred from responding to potential subpoenas and requests for information from government agencies including the SEC;

      (c)    costs incurred from potential fines in connection with governmental investigations;

       (d)      costs incurred from increased Directors and Officer's Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

       (e)      enormous tax liabilities from improper deductions taken on backdated option grants;

       (f)      costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

       (g)      costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

       (h)      costs incurred from directing manpower to correct BBB's defective internal controls; and

       (i)      costs incurred from directing manpower to potentially restate BBB's prior financial results to correct for the improperly dated stock option grants.

56.     A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 8%. A similar 8% fall in BBB's market value would result in a decline of over $904 million.

**THE BOARD'S DUTY TO**
**ADMINISTER THE STOCK OPTION PLANS**

57.     The Board and Compensation Committee were duty bound to administer the 1992 Plan, 1996 Plan, 1998 Plan and the 2000 Plan. The 1992 Plan specifically spelled out this responsibility as follows: "[t]he Plan shall be administered by a committee … of two or more directors appointed from time to time by the Board." Similarly, the 1996 Plan provides that "[t]he Plan shall be administered by one or more committees appointed from time to time by the Board…." The 1998 Plan and 2000 Plan contain identical language as to the administration of the plan. Accordingly, the Board of Directors and the two Stock Option Committees were directly responsible for the backdating and violations of the plans.

58.     The Audit Committee of the Board is responsible by its charter for overseeing BBB's accounting and financial reporting processes.

- 21 -

59.     Accordingly, defendants Temares, Feinstein, Kaplan, Eppler, Adler, Morrison and Forester, who were directors on the Board or members of the Stock Option Committees and Audit Committees between 1993 and 2002 and were directly responsible for the stock-option backdating improprieties.  Thus, these defendants are liable to BBB together with the defendants who received backdated options.

60.     The Director Defendants who joined the Board after 2002 are also liable to the Company for their improprieties in connection with concealing or failing to uncover defendants' illegal backdating practices until September 20, 2006.  These defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing and should have known about the illegal backdating practices due to their fiduciary duties outlined above.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

62.      During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Company insiders were improperly backdating their stock option grants; (ii) conceal the fact that as a result of the improperly backdated stock option grants, the Company's financial statements were inaccurate; (iii) maintain the Individual Defendants' executive and directorial positions at BBB and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iv) deceive the shareholders of BBB, regarding the level of compensation being paid to the Company's insiders and the Company's financial condition and future business prospects; and (v) artificially inflate the price of BBB common stock so they could dispose of over $1.1 billion of their personally held stock.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

63.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time the Individual Defendants caused the Company to conceal the true fact that BBB was misrepresenting its financial results and that BBB insiders were improperly backdating their stock option grants.

64.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to grant themselves and other insiders undisclosed and unaccounted for compensation in the form of backdated stock option grants and to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, insider trading abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

65.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

67.     BBB  operates as a national chain of retail stores that sell domestic merchandise including bed linens, bath items, kitchen textiles, home furnishings and other housewares.

68.     On March 18, 2006, *The Wall Street Journal* published an article entitled: "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck – or something else?"  The article stated in pertinent part:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was

27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.

The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.

\* \* \*

Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

69.     On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

## DEFENDANTS' ILLEGAL BACKDATING PRACTICES

70.     Dating back to at least 1993, the Individual Defendants have caused or allowed BBB insiders to manipulate their stock option grant dates so as to illegally maximize their profits from the stock options.  Specifically, Company insiders changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date.  The price of BBB shares on the reported option-grant date, therefore, was lower than the share price on the actual day the options were issued, thus providing defendants with more favorably priced options.  The BBB Board, in turn, approved the grants of the options to BBB insiders even though those options were improperly backdated.

71.     Further, the backdating of options granted to corporate insiders brought an instant paper gain to these insiders because the options were priced below the stock's fair market value when they were actually awarded.  Under GAAP, this instant paper gain was equivalent to extra compensation and was thus a cost to BBB.  Accordingly, since BBB failed to include the costs associated with this extra compensation in its financial results, its profits were overstated during the fiscal periods in which the options were granted.  A restatement of BBB's past financial results will be necessary to correct for these improprieties.

72.     Specifically, since 1993, the Individual Defendants have caused or allowed BBB to report improper financial results—materially overstating its earnings—as follows:

| Fiscal Year | Reported Earnings (in thousands) | Reported Diluted EPS |
|---|---|---|
| 1993 | $15,960 | $0.06 |
| 1994 | $21,887 | $0.08 |
| 1995 | $30,013 | $0.11 |
| 1996 | $39,459 | $0.14 |
| 1997 | $55,015 | $0.20 |
| 1998 | $73,142 | $0.26 |
| 1999 | $97,346 | $0.34 |
| 2000 | $131,229 | $0.46 |
| 2001 | $171,922 | $0.59 |
| 2002 | $219,599 | $0.74 |
| 2003 | $302,179 | $1.00 |
| 2004 | $399,470 | $1.31 |
| 2005 | $504,964 | $1.65 |
| 2006 | $572,847 | $1.92 |

**Stock Splits:  7/9/93 (2:1), 5/1/96 (2:1), 8/3/98 (2:1), 8/14/00 (2:1)**
EPS adjusted for all stock splits

73.     In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have severe tax consequences.  While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment.  In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants.  For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*.  Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

74.     In light of these serious potential tax-related ramifications, the IRS is now examining as many as 40 companies being investigated for backdating stock options to determine whether they owe millions of dollars in unpaid taxes.  On July 28, 2006, *The New York Times* published an article entitled "I.R.S. Reviewing Companies in Options Inquiries," which stated:

> The Internal Revenue Service is examining as many as 40 companies ensnared in various stock options investigations to determine whether they owe millions of dollars in unpaid taxes.
>
> In the last few weeks, the agency has directed its corporate auditors to start reviewing the tax returns of dozens of executives and companies, which may have improperly reported stock option grants. These preliminary investigations are expected to take months, but if there is early evidence of widespread tax trouble, I.R.S. officials said they were prepared to step up their effort.
>
> "Where there are indications of mischief, we want to now look at those cases and see if they complied with tax laws," said Bruce Ungar, the agency's deputy commissioner for large and midsize businesses. "It is possible that they are compliant, but the early indication is that there is a good likelihood there is some noncompliance.
>
> "If this is a big problem, we will apply more resources," he added.
>
> The I.R.S. auditors are focusing on the potential tax obligations from backdated stock options that have been cashed out since 2002. Federal rules bar the I.R.S. from opening cases that are more than three years old. Still, tax lawyers estimate the agency could reap hundreds of millions of dollars from civil penalties, unpaid taxes and interest payments if widespread wrongdoing is found.

The agency appears to be taking aim both at companies that took improper tax deductions, and at executives who received favorable tax treatment and might have misreported income.

So far, rank-and-file employees who simply received potentially backdated stock options are not in the agency's cross hairs.

"If you were involved in the mischief, you would want to be worried," Mr. Ungar said. "If you weren't involved in it, then you are not in the same situation."

The tax scrutiny is the latest twist in what is perhaps the biggest financial scandal of the year and comes as the agency cracks down on misreported executive pay. The I.R.S. follows several other federal agencies that have begun investigations into the myriad problems that arise from improperly reported or backdated stock option grants.

The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it underlined that focus with new rules on reporting executive compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

By itself, backdating stock option grants is not necessarily illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

But backdating — effectively granting stock options with a discount — automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

"If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

"Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dozens of companies have come forward. In a statement, he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the S.E.C.'s enforcement division. She indicated that there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.

For now, I.R.S. officials are reviewing the files of 30 to 40 of the companies that have publicly disclosed problems, including some already facing scrutiny on other tax issues. Mr. Ungar said it could take months to more than a year before these initial cases are resolved. Much of the information will need to be supplied by the companies themselves, not taken from tax returns. I.R.S. officials have not yet been in touch with the Justice Department about potential tax fraud.

75.     BBB is or will be added to the list of companies currently investigated by the IRS because of defendants' rampant backdating practices and the millions of dollars worth of improper deductions taken by the Company.

## MANIPULATED STOCK OPTION GRANTS

76.     The following charts identify various examples of instances between 1996 and 2002 in which options were purportedly dated at or very near the lowest share price for the month, quarter or year in which they were granted:











May 1998 Stock Option Grants

On May 27, 1998, defendants purportedly granted the following options at an exercise price of $47.31 per share - the lowest share price for the months of April 2,1998 through June 23, 1998 - to the following Bed Bath & Beyond Inc. insiders:

| | |
|---|---|
| Steven H. Temares (1) | 100,000 |
| Arthur Stark (1) | 40,000 |
| Matthew Fiorilli (1) | 40,000 |

(1) On July 10, 1998, defendants Temares, Stark and Fiorilli disclosed these grants on a Form 4.



May 1999 Stock Option Grants

On May 26, 1999, defendants purportedly granted the following options at an exercise price of $32.25 per share - the lowest share price for the period beginning March 25, 1999 through August 2, 1999 - to the following Bed Bath & Beyond Inc. insiders:

| | | | |
|---|---|---|---|
| Arthur Stark | 50,000 | Ronald Curwin | 10,000 |
| Matthew Fiorilli | 50,000 | | |

On June 10, 1999, defendants Fiorilli, Stark and Curwin disclosed these grants on a Form 4.









### THE TRUTH COMES TO LIGHT REGARDING DEFENDANTS' ILLEGAL BACKDATING PRACTICES

77.     On June 19, 2006, in reaction to analyst reports that identified suspicious option grants at BBB, the Company initiated an internal investigation of its stock option grant practices from 1992 to May 15, 2006.  On September 20, 2006, BBB learned that the SEC was commencing its own inquiry into the Company's stock-option backdating practices.

78.     One day later, on September 21, 2006, defendants, for the first time, disclosed the SEC and internal investigations.

79.     On October 10, 2006, BBB issued a Form 8-K disclosing the findings of the internal investigation.  Importantly, the investigation uncovered "various deficiencies in the process of granting and documenting stock options and restricted shares."  Further, the Company concluded that: (i) "hindsight was used in selecting some annual grant dates"; (ii) "[t]he option granting process had control and other deficiencies"; and (iii) "[t]he Company failed to maintain adequate controls with respect to issuance of options in compliance with the Company's stock option policies; the Company's polices were also not sufficient to ensure compliance with all applicable accounting rules."

80.     In total, the investigation found 16 annual, 26 monthly and 2 special grant dates in which defendants used improper measurement dates.  To correct for the accounting of these stock options, defendants have opted to record a $66 million reclassification on the equity section of the Company's consolidated balance sheet to be included in BBB's FY:07 Form 10-K.  Further, the Company will record an $8 million charge on its consolidated statement of earnings to be included in BBB's 3Q:06 Form 10-Q.

### DEFENDANTS' ILLEGAL BACKDATING PRACTICES ARE MATERIAL

81.     Defendants' accounting treatment of over $74 million of improperly accounted for stock option expenses is dependent on their conclusion that these errors are immaterial.  Defendants' materiality opinion, however, will likely not be shared by the SEC.  The SEC and applicable accounting rules dictate that issues related to the integrity of management are always material.

Defendants' participation in a scheme to backdate options and pay themselves secret paper profits definitely speaks to their integrity.

82.     Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *In re TSC Industries*, 426 U.S. at 449 and in SEC SAB 99, released August 12, 1999. The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available."  426 U.S. at 449.  SAB 99 further explains that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.

83.     SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone. Qualitative factors that can make a misstated fact material include, among others:

(a)     whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)     whether the misstatement arises from an item "capable of precise measurement";

(c)     whether the misstatement masks a change in earnings;

(d)     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)     whether the misstatement affects the registrant's compliance with regulatory requirements.

84.     The improper backdating of stock options is material under each criterion above individually, and is material under all of the criteria collectively.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about BBB. That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's. As the SEC ruled in the administrative case *In re Franchard Corp*., the

integrity of a company's management "is always a material factor." 42 S.E.C. at 163. Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation. Third, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured. Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses. Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability. Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses. Thus, defendants' illegal stock-option backdating practices are material under these qualitative factors.

85. Moreover, under applicable accounting rules, a financial misstatement that appears immaterial as to a single reporting period can have a cumulative material impact on other periods. In such a situation, the misstatement must be corrected, according to SEC SAB 108. Although SAB 108 is dated September 13, 2006, it draws on years of prior accounting literature and practice that defendants must take into account in correcting BBB's financials. Thus, defendants can not hide the materiality of their backdating practices by spreading the errors related to those practices over several financial periods and can not claim that "charges are not material to [BBB's] financial statements in any of the periods in which such charges would have been related ...."

86. Thus, under applicable SEC and accounting rules and pronouncements, BBB will likely be required to file a restatement to correct for the $74 million in improperly accounted for stock option expenses. Defendants can not hide those errors in reclassifications and expense charges.

### DAMAGES TO BBB

87. As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a) costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)      costs incurred from responding to potential subpoenas and requests for information from government agencies including the SEC;

(c)      costs incurred from potential fines in connection with governmental investigations;

(d)      costs incurred from increased Directors and Officer's Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)      enormous tax liabilities from improper deductions taken on backdated option grants;

(f)      costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(g)      costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(h)      costs incurred from directing manpower to correct BBB's defective internal controls; and

(i)      costs incurred from directing manpower to potentially restate BBB's prior financial results to correct for the improperly dated stock option grants.

88.      A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 8%. A similar 8% fall in BBB's market value would result in a decline of over $904 million.

## IMPROPER FINANICAL REPORTING RELATING TO DEFENDANTS' STOCK OPTION MANIPULATIONS

89.      Between 1993 and the present, the Individual Defendants caused or allowed BBB to file Form 10-Qs and Form 10-Ks that presented the Company's financial results in violation of GAAP, due to improper accounting for backdated or otherwise manipulated stock option grants. Specifically, BBB's compensation expenses were understated and its net earnings were overstated.

90.      The 1993 through 2006 Form 10-Qs and Form 10-Ks were reviewed, prepared and/or endorsed by the Individual Defendants. The following chart details the defendants and other

individuals who signed and certified these filings under the SOX:

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 10/10/2006 | 10-Q | Eugene A. Castagna (CFO and Treasurer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (CFO) |
| 10/6/2006 | NT10-Q | Eugene A. Castagna (CFO and Treasurer) |
| 7/6/2006 | 10-Q | Eugene A. Castagna (CFO and Treasurer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (CFO) |
| 5/12/2006 | NT10-K | Eugene A. Castagna (CFO and Treasurer) |
| 5/12/2006 | 10-K | Warren Eisenberg (Co−Chairman); Leonard Feinstein (Co−Chairman); Steven H. Temares (CEO); Eugene A. Castagna (CFO and Treasurer); Dean S. Adler (Director); Stanley Barshay (Director); Klaus Eppler (Director); Jordan Heller (Director); Robert S. Kaplan (Director); Victoria A. Morrison (Director); Fran Stoller (Director) **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (CFO) |
| 1/5/2006 | 10-Q | Eugene A. Castagna (CFO and Treasurer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (CFO) |
| 10/5/2005 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 7/6/2005 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 5/12/2005 | 10-K | Warren Eisenberg (Co-Chairman and Director); Leonard Feinstein (Co−Chairman and Director); Steven H. Temares (President, CEO, and Director); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer); Dean S. Adler (Director); Stanley Barshay (Director); Klaus Eppler (Director); Jordan Heller (Director); Victoria A. Morrison (Director); Fran Stoller (Director) **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 1/12/2005 | 10-Q/A | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 1/4/2005 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 9/30/2004 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 7/7/2004 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 5/13/2004 | 10-K | Warren Eisenberg (Co-Chairman and Director); Leonard Feinstein (Co−Chairman and Director); Steven H. Temares (President, CEO, and Director); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer); Stanley Barshay (Director); Klaus Eppler (Director); Jordan Heller (Director); Victoria A. Morrison (Director); Fran Stoller (Director) **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |

| 1/12/2004 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
|---|---|---|
| 10/10/2003 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 7/14/2003 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 5/29/2003 | 10-K | Warren Eisenberg (Co-Chairman and Director); Leonard Feinstein (Co-Chairman and Director); Steven H. Temares (President, CEO, and Director); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer); Dean S. Adler (Director); Klaus Eppler (Director); Robert S. Kaplan (Director); Victoria A. Morrison (Director); **SOX CERTIFICATION:** Steven H. Temares (CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 1/14/2003 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Warren Eisenberg (Co−CEO); Leonard Feinstein (Co-CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 10/11/2002 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer); **SOX CERTIFICATION:** Warren Eisenberg (Co−CEO); Leonard Feinstein (Co-CEO); Eugene A. Castagna (Vice President - Finance and Assistant Treasurer) |
| 7/12/2002 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer) |
| 5/31/2002 | 10-K | Warren Eisenberg (Co-Chairman, Co−CEO, and Director); Leonard Feinstein (Co-Chairman, Co−CEO, and Director); Steven H. Temares (President, Chief Operating Officer, and Director); Eugene A. Castagna (Vice President - Finance); Dean S. Adler (Director); Klaus Eppler (Director); Robert S. Kaplan (Director); Victoria A. Morrison (Director) |
| 1/14/2002 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer) |
| 10/15/2001 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer) |
| 7/16/2001 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer) |
| 5/31/2001 | 10-K | Warren Eisenberg (Chairman, Co−CEO, and Director); Leonard Feinstein (President, Co−CEO, and Director); Steven H. Temares (President, Chief Operating Officer, and Director); Eugene A. Castagna (Vice President - Finance); Klaus Eppler (Director); Robert S. Kaplan (Director); Robert J. Swartz (Director) |
| 1/9/2001 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer) |
| 10/10/2000 | 10-Q | Eugene A. Castagna (Vice President - Finance and Principal Accounting Officer) |
| 7/11/2000 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 5/26/2000 | 10-K | Warren Eisenberg (Chairman, Co−CEO, and Director); Leonard Feinstein (President, Co−CEO, and Director); Steven H. Temares (President, Chief Operating Officer, and Director); Ronald Curwin (CFO and Treasurer); Eugene A. Castagna (Vice President − Controller); Klaus Eppler (Director); Robert S. Kaplan (Director); Robert J. Swartz (Director) |

| 1/11/2000 | 10-Q | Ronald Curwin (CFO and Treasurer) |
|---|---|---|
| 10/12/1999 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 7/13/1999 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 5/27/1999 | 10-K | Warren Eisenberg (Chairman, Co−CEO, and Director); Leonard Feinstein (President, Co−CEO, and Director); Ronald Curwin (CFO and Treasurer); G. William Waltzinger, Jr. (Vice President - Finance); Klaus Eppler (Director); Robert S. Kaplan (Director); Robert J. Swartz (Director) |
| 1/11/1999 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 10/9/1998 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 7/13/1998 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 5/29/1998 | 10-K | Warren Eisenberg (Chairman, Co−CEO, and Director); Leonard Feinstein (President, Co−CEO, and Director); Ronald Curwin (CFO and Treasurer); Klaus Eppler (Director); Robert S. Kaplan (Director); Robert J. Swartz (Director) |
| 1/12/1998 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 10/14/1997 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 7/15/1997 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 5/28/1997 | 10-K | Warren Eisenberg (Chairman, Co−CEO, and Director); Leonard Feinstein (President, Co−CEO, and Director); Ronald Curwin (CFO and Treasurer); Klaus Eppler (Director); Robert S. Kaplan (Director); Robert J. Swartz (Director) |
| 1/7/1997 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 10/9/1996 | 10-Q/A | Ronald Curwin (CFO and Treasurer) |
| 10/8/1996 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 6/26/1996 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 5/24/1996 | 10-K | Warren Eisenberg (Chairman, Co−CEO, and Director); Leonard Feinstein (President, Co−CEO, and Director); Klaus Eppler (Director); Robert S. Kaplan (Director); Robert J. Swartz (Director); Ronald Curwin (Chief Financial Officer and Treasurer) |
| 12/20/1995 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 9/22/1995 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 6/23/1995 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 5/30/1995 | 10-K | Warren Eisenberg (Chairman, Co-CEO and Director), Ronald Curwin (CFO and Treasurer), Leonard Feinstein (President, Co-CEO and Director), Klaus Eppler (Director), Robert S. Kaplan (Director), Robert J. Swartz (Director). |
| 1/12/1995 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 10/12/1994 | 10-Q | Ronald Curwin (CFO and Treasurer) |
| 7/13/1994 | 10-Q | Richard D. Falcone (CFO and Treasurer) |
| 5/26/1994 | 10-K | Warren Eisenberg (Chairman, Co-CEO and Director), Leonard Feinstein (President, Co-CEO and Director), Robert J. Swartz (Director), Klaus Eppler (Director), Richard D. Falcone (CFO and Treasurer) |
| 1/12/1994 | 10-Q | Richard D. Falcone (CFO and Treasurer) |
| 10/14/1993 | 10-Q | Richard D. Falcone (CFO and Treasurer) |
| 7/14/1993 | 10-Q | Richard D. Falcone (CFO and Treasurer) |
| 5/25/1993 | 10-K | Warren Eisenberg (Chairman, Co-CEO and Director), Leonard Feinstein (President, Co-CEO and Director), Robert J. Swartz (Director), Klaus Eppler (Director), Richard D. Falcone (CFO and Treasurer) |

91.    The SOX certifications signed in conjunction with the filing of BBB's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to BBB's 2004 Form 10-K that was signed by defendants Temares and Castagna:

I, [Steven H. Temares/Eugene A. Castagna], [Principal Executive Officer/Principal Financial Officer], certify that:

1.      I have reviewed this annual report on Form 10-K of Bed Bath & Beyond Inc.;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

      a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      b.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      c.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

92.     Defendants Feinstein and Eisenberg signed similar certifications under SOX for

BBB's Form 10-Qs filed on October 11, 2002 and January 14, 2003.

## DEFENDANTS' ACTIVELY CONCEALED THEIR ILLEGAL BACKDATING PRACTICES

93.     At times relevant hereto, defendants took affirmative steps to conceal their backdating actions by authorizing or otherwise causing the Company to issue proxy statements, Form 3s, Form 4s, Form 5s, Form 10-Qs, Form 10-Ks and other SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to BBB insiders.  These false disclosures prevented plaintiff from recognizing that BBB insiders were illegally backdating their stock option grants.

94.     Indeed, prior to the March 18, 2006 *Wall Street Journal* article, titled "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable.  Luck – or something else?", the public consensus was that favorable option timing could be largely explained by an insider's ability to predict that favorable company news was coming and that insiders were timing grants to take advantage of it.  This consensus was not challenged until academic research— that included examinations of thousands of companies—revealed that it was likely that grant dates had been filled in retroactively.

95.     Thus, due to the public consensus that favorable option timing could be explained away by an insiders' ability to predict the stock price and defendants' active concealment of their backdating practices, shareholders were prevented from recognizing the validity of the claims prior to the March 18, 2006 *Wall Street Journal* article.  Even after that article was published, there were insufficient warnings that implicated BBB in the backdating scandal. The first public disclosure of backdating specifically at BBB did not occur until September 21, 2006.

96.     Further, plaintiff's ignorance of defendants' illegal backdating practices was not attributable to a lack of due diligence.  It would be unreasonable to expect plaintiff—a typical shareholder—to undertake costly and extensive academic research and statistical analysis when defendants' false public statements indicated that stock options were being properly granted.  In any case, plaintiff was entitled to rely upon the truthfulness of the disclosures contained within BBB's public statements and SEC filings.

97.     Within weeks of the September 21, 2006 public disclosure of backdating practices at BBB, plaintiff conducted an investigation of defendants' prior option grants, discovered numerous suspicious grants dated at extremely favorable exercise prices and expeditiously brought this action on behalf of BBB to preserve the Company's claims against the wrongdoers responsible for illegal backdating.

## ILLEGAL INSIDER SELLING

98.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of BBB stock that they had obtained, often by cashing in backdated stock options:

| Name | Start Date | End Date | Shares | Total |
|------|-----------|----------|--------|-------|
| CASTAGNA | 3/9/2000 | 11/8/2004 | 140,400 | $5,525,048.00 |
| CURWIN | 4/4/1997 | 7/18/2001 | 199,000 | $6,331,230.00 |
| EISENBERG | 5/30/1996 | 5/11/2006 | 15,081,523 | $535,470,055.07 |
| FEINSTEIN | 5/30/1996 | 5/11/2006 | 14,293,791 | $515,533,132.32 |
| FIORILLI | 10/20/1998 | 11/1/2002 | 667,000 | $20,242,950.00 |
| KAPLAN | 6/30/1997 | 9/16/2005 | 214,196 | $7,373,790.80 |
| STARK | 10/21/1998 | 7/12/2001 | 712,000 | $19,757,020.00 |
| TEMARES | 7/9/1997 | 11/8/2004 | 1,207,000 | $40,311,590.00 |
| Total: | | | 32,514,910 | $1,150,544,816.19 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of BBB to redress injuries suffered, and to be suffered, by BBB as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  BBB is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100.    Plaintiff will adequately and fairly represent the interests of BBB in enforcing and prosecuting its rights.

101.    Plaintiff is and was an owner of the stock of BBB during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

102. The current Board of BBB consists of the following ten individuals: defendants Temares, Eisenberg, Feinstein, Kaplan, Eppler, Adler, Morrision, Barshay, Heller and Stoller. Plaintiff did not make any demand on the Board of BBB to institute this action because such a demand would be a futile, wasteful and useless act.

103. The Board is responsible for approving the compensation awarded to BBB's insiders. This compensation includes the stock options that were secretly backdated by BBB insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to BBB in approving the option grants as dated. The Board should have properly informed itself of the circumstances surrounding the options granted to BBB's insiders before approving them. Indeed, these options were routinely approved by the Board when they were dated at the Company's lowest closing price for the respective month in which the options were granted establishing that these decisions were not informed. Accordingly, there is reason to doubt that defendants Temares, Eisenberg, Feinstein, Kaplan, Eppler, Adler, Morrision, Barshay, Heller and Stoller are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to BBB. The Board's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to defendants Temares, Eisenberg, Feinstein, Kaplan, Eppler, Adler, Morrision, Barshay, Heller and Stoller.

104. At times relevant hereto, the Board formed two Stock Option Committees to administer the Company's stock option plans. One of these committees was responsible for stock option grants to the Company's lower level employees while the other committee was responsible for grants to the Company's executives and directors. The 1992 Plan specifically spelled out this responsibility as follows: "[t]he Plan shall be administered by a committee … of two or more directors appointed from time to time by the Board." Similarly, the 1996 Plan provides that "[t]he Plan shall be administered by one or more committees appointed from time to time by the Board…." The 1998 Plan and 2000 Plan contain identical language as to the administration of the plan. This responsibility, although held by the Board, was delegated to these two Stock Option Committees. Defendants Eisenberg and Feinstein were members of the Stock Option Committee responsible for grants to lower level employees from 1993 to 2003. Defendant Kaplan was a member of the Stock

Option Committee responsible for grants to executives and directors from 1994 to 2003. Defendant Eppler was also a member of the Stock Option Committee responsible for grants to executives and directors from 1993 to 1996 and defendants Adler and Morrison were members of that committee from 2001 to 2003. These defendants were responsible as members of the Stock Option Committees to review and grant stock options granted to BBB insiders during their respective tenures on the committees. Clearly, these defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that defendants Eisenberg, Feinstein, Kaplan, Eppler, Adler and Morrison are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to BBB. The Stock Option Committees' decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to defendants Eisenberg, Feinstein, Kaplan, Eppler, Adler and Morrison.

105. The Audit Committee of the Board is responsible by its charter for: (i) reviewing BBB's annual and quarterly financial reports; and (ii) overseeing BBB's accounting and financial reporting processes. The Audit Committee is comprised of defendants Adler, Barshay and Heller. Defendant Adler has been a member of the Audit Committee since 2001; and defendants Barshay and Heller has been a member of the Audit Committee since 2003. Defendant Eppler was a member of the Audit Committee from 1993 to 2003; defendant Kaplan was a member of the Audit Committee from 1994 to 2002. These defendants were responsible as members of the Audit Committee for insuring that BBB's accounting and financial processes including its internal controls were adequate and that the Company's quarterly and annual financial statements were accurate. BBB's internal controls, however, were deficient as evidenced by its insiders' improper backdating of stock option grants. As a result of the improper option backdating, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to BBB's insiders. Further, these defendants are attempting to conceal the improper accounting treatment of defendants' illegally backdated options in $74 million worth of reclassifications and expense charges. This accounting treatment is based upon the Audit

Committee's conclusion that these errors are not material. This conclusion is untenable under applicable SEC and accounting rules and pronouncements. First, issues related to managerial integrity are always material. Second, defendants can not evade the a materiality issues by spreading the errors over several financial periods and claiming that the errors are not material to any particular period. The Audit Committee's actions to "hide the ball" are indicative of their inability and unwillingness to consider a presuit demand by plaintiff. Accordingly, there is a reasonable doubt that defendants Adler, Barshay, Heller, Eppler and Kaplan are disinterested because they would be unwilling to take the action requested by plaintiff and they each face sufficiently substantial liability for their breaches of fiduciary duty to BBB. Thus, demand would have been futile as to defendants Adler, Barshay, Heller, Eppler and Kaplan.

106. Defendants Temares, Eisenberg and Feinstein are liable to BBB for the undeserved compensation that they received as a result of the stock options that they backdated or otherwise manipulated. Accordingly, there is a reasonable doubt that defendants Temares, Eisenberg and Feinstein are disinterested because they face a sufficiently substantial liability to BBB in connection with their improperly dated BBB stock options. Thus, demand is futile as to defendants Temares, Eisenberg and Feinstein.

107. Each of the defendants knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information regarding the improper accounting as a result of their access to and review of internal corporate documents, attendance at Board meetings, and conversations and connections with other corporate officers, employees and directors. However, the following current members of the BBB Board participated in the illegal insider selling (some of which include the selling of stock acquired through the exercising of illegally backdated stock options):

(a) Defendant Eisenberg sold 15,081,523 of his personally held shares for $535,470,055.07 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices;

(b)     Defendant Feinstein sold 14,293,791 of his personally held shares for $515,533,132.32 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices;

(c)     Defendant Temares sold 1,207,000 of his personally held shares for $40,311,590 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices; and

(d)     Defendant Kaplan sold 214,196 of his personally held shares for $7,373,790.80 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock-option grant practices.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Also, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties for insider selling.  Since the defendants have breached their fiduciary duties and are interested, any demand upon them is futile.

108.     The principal professional occupation of defendant Eisenberg is his employment with BBB, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, defendant Eisenberg was paid the following compensation at times relevant hereto:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Eisenberg | 2005 | $1,100,000 | $2,400,002 | 100,000 | - |
| | 2004 | $1,081,000 | - | 300,000 | $71,744 |
| | 2003 | $981,000 | - | 400,000 | $61,749 |
| | 2002 | $883,000 | - | 300,000 | $253,721 |
| | 2001 | $792,000 | - | 300,000 | $343,942 |
| | 2000 | $750,000 | - | 300,000 | - |
| | 1999 | $750,000 | - | 400,000 | $321,468 |
| | 1998 | $750,000 | - | - | $318,439 |
| | 1997 | $750,000 | - | 500,000 | $317,758 |
| | 1996 | $750,000 | - | - | $319,574 |

Accordingly, defendant Eisenberg lacks independence from defendants Adler, Morrison and Stoller, defendants who are not disinterested and/or independent and who exert influence over defendant Eisenberg's compensation by virtue of their positions as members of the Compensation Committee.

The Compensation Committee has the authority to review and approve Eisenberg's base salary, bonus and equity compensation. This lack of independence rendered defendant Eisenberg incapable of impartially considering a demand to commence and vigorously prosecute this action.

109.    The principal professional occupation of defendant Feinstein is his employment with BBB, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, defendant Feinstein was paid the following compensation at times relevant hereto:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Feinstein | 2005 | $1,100,000 | $2,400,002 | 100,000 | - |
| | 2004 | $1,081,000 | - | 300,000 | $60,133 |
| | 2003 | $981,000 | - | 400,000 | $60,602 |
| | 2002 | $883,000 | - | 300,000 | $221,898 |
| | 2001 | $792,000 | - | 300,000 | $281,291 |
| | 2000 | $750,000 | - | 300,000 | $275,752 |
| | 1999 | $750,000 | - | 400,000 | $271,972 |
| | 1998 | $750,000 | - | - | $261,050 |
| | 1997 | $750,000 | - | 500,000 | $258,381 |
| | 1996 | $750,000 | - | - | $258,828 |

Accordingly, defendant Feinstein lacks independence from defendants Adler, Morrison and Stoller, defendants who are not disinterested and/or independent and who exert influence over defendant Feinstein's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Feinstein's base salary, bonus and equity compensation. This lack of independence rendered defendant Feinstein incapable of impartially considering a demand to commence and vigorously prosecute this action.

110.    The principal professional occupation of defendant Temares is his employment with BBB, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, defendant Temares was paid the following compensation at times relevant hereto:

| Defendant | Fiscal Year | Salary | Restricted Stock Awards | Securities Underlying Options | Defendant |
|---|---|---|---|---|---|
| Temares | 2005 | $1,131,000 | $2,400,002 | 200,000 | Temares |
| | 2004 | $1,031,000 | - | 300,000 | |
| | 2003 | $931,000 | - | 400,000 | |

| 2002 | $833,000 | - | 300,000 |
| 2001 | $733,000 | - | 300,000 |
| 2000 | $633,000 | - | 300,000 |
| 1999 | $525,000 | - | 200,000 |
| 1998 | $383,000 | - | 100,000 |
| 1997 | $292,000 | - | 100,000 |
| 1996 | $199,000 | - | 25,000 |

Accordingly, defendant Temares lacks independence from defendants Adler, Morrison and Stoller, defendants who are not disinterested and/or independent and who exert influence over defendant Temares' compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Temares' base salary, bonus and equity compensation. This lack of independence rendered defendant Temares incapable of impartially considering a demand to commence and vigorously prosecute this action.

111.   Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

112.   The Director Defendants of BBB, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from BBB's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

113.   In order to bring this suit, all of the directors of BBB would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

114.   The acts complained of constitute violations of the fiduciary duties owed by BBB's officers and directors and these acts are incapable of ratification.

115.   BBB has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for BBB any part of the damages BBB suffered and will suffer thereby.

116.   If BBB's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this

Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of BBB. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by BBB against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of BBB, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause BBB to sue them, since they will face a large uninsured liability.

117. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for BBB for any of the wrongdoing alleged by plaintiff herein.

118. Plaintiff has not made any demand on shareholders of BBB to institute this action since such demand would be a futile and useless act for the following reasons:

(a) BBB is a publicly held company with over 282 million shares outstanding, and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Temares, Eisenberg, Feinstein and Castanga for Disgorgement under the Sarbanes-Oxley Act of 2002

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

> (a)    **Additional compensation prior to noncompliance with commission financial reporting requirements**.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, ***the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for*** –
>
> > 1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
> >
> > 2.    any profits realized from the sale of securities of the issuer during that 12-month period.
>
> (b)    **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

121.    BBB will likely restate its financial statements filed from 1993 to the present due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the SOX.  As a result, defendant Temares, as BBB's CEO from 2003 to the present, defendant Eisenberg as BBB's Co-CEO from 1971 to April 2003, defendant Feinstein as BBB's Co-CEO from 1971 to April 2003 and defendant Castanga as BBB's Principal Accounting Officer from 2001 to January 2006 and CFO from January 2006 to the present, are required to reimburse BBB for all bonuses or other

incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the SOX) through the present.

122.    Further, defendants Temares, Eisenberg, Feinstein and Kaplan also are liable to BBB for any profits realized from the sales of securities by the Company during that same period of time.

123.    Defendants Temares, Eisenberg, Feinstein and Kaplan are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of BBB.

## COUNT II

### Against the Director Defendants for Violation of Section 14(a) of the Exchange Act

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    The Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders which were contained in the Company's proxy statements issued on May 25, 1994, June 30, 1995, May 28, 1996, May 16, 1997, May 20, 1998, May 17, 1999, May 24, 2000, May 24, 2001, May 5, 2002, May 29, 2003, May 28, 2004, June 1, 2005 and May 24, 2006 (collectively referred to as the "Proxies"). The May 25, 1994 proxy contained a proposal to BBB's shareholders that they vote to approve an increase in the number of shares issueable under the 1992 Plan. The May 28, 1996 proxy contained a proposal to BBB's shareholders that they vote to approve the 1996 Plan. The May 20, 1998 proxy contained a proposal to BBB's shareholders that they vote to approve the 1998 Plan. The May 24, 2000 proxy contained a proposal to BBB's shareholders that they vote to approve the 2000 Plan. The Proxies, however, misrepresented and failed to disclose that the Company's executives were engaged in the improper backdating or manipulation of stock options and that the Board was approving those options as dated. By reasons of the conduct alleged herein, the Director Defendants, who were directors that caused or allowed the issuance of the Proxies, violated §14(a) of the Exchange Act. As a direct and proximate result of the Director Defendants' wrongful conduct, BBB misled and/or deceived its shareholders by falsely portraying how the plans would be administrated.

126.    The Proxies also falsely portrayed the compensation paid to BBB's insiders

because the compensation presented did not take into account defendants' illegally backdated options. These false compensation figures were republished in various proxies from 1993 to the present.

127.     This information would have been material to BBB's shareholders in determining whether or not to approve the plans and amendment contained in the Proxies. This information was also material to the integrity of the directors that were proposed for election to the Board.

128.     Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *In re TSC Industries*, 426 U.S. at 449 and in SEC SAB 99, released August 12, 1999. The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." 426 U.S. at 449. SAB 99 further explains that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.

129.     SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone. Qualitative factors that can make a misstated fact material include, among others:

(a)     whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)     whether the misstatement arises from an item "capable of precise measurement";

(c)     whether the misstatement masks a change in earnings;

(d)     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)     whether the misstatement affects the registrant's compliance with regulatory requirements.

130.     The improper backdating of stock options is material under each criterion above individually, and is material under all of the criteria collectively. First, there is a substantial

likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about BBB. That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's. As the SEC ruled in the administrative case *In re Franchard Corp.*, the integrity of a company's management "is always a material factor." 42 S.E.C. at 163. Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation. Third, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured. Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses. Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability. Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses. Thus, defendants' illegal stock-option backdating practices are material under these qualitative factors and should have been disclosed in the Proxies.

131.    Plaintiff, on behalf of BBB, thereby seeks relief for damages inflicted upon the Company in connection with the improper approval of the plans and amendment based upon the misleading and incomplete proxy materials. Plaintiff, on behalf of BBB, also seeks a disgorgement of the compensation paid to the Individual Defendants in connection with the plans described in the Proxies and to void the election of the directors proposed in the Proxies that falsely portrayed their integrity.

## COUNT III

### Derivatively Against All Defendants for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    Between 1993 and the present, the Individual Defendants disseminated or approved financial statements that did not disclose the backdating practices that were occurring at BBB and

the resulting effects of those practices on the Company's financial results. Specifically, BBB's financial statements included financial results that did not properly account for stock options that were granted below fair market value as required under GAAP. The Individual Defendants knew or recklessly disregarded the fact that the Company's financial statements were misleading—due to the backdating—in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134. The Insider Selling Defendants also sold over 32.5 million shares of BBB's common stock at inflated prices between 1997 and the present, receiving over $1.1 billion in proceeds, while in possession of material non-public information. These defendants misappropriated BBB's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold BBB stock without disclosing the information alleged to have been concealed herein.

135. At the same time the price of the Company's common stock was inflated due to the improperly accounted for stock options and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing BBB to repurchase approximately $950 million worth of its own stock on the open market at inflated prices between 2004 and 2006. The Company's share price was artificially inflated during this period due to the improper accounting treatment of backdated options that were granted under fair market value. Under applicable accounting rules, these options should have been expensed during their respective vesting periods. Thus, BBB's 2004 through 2006 financials falsely portrayed the Company's true financial results.

136. As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)    employed devices, schemes and artifices to defraud;

      (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    engaged in acts, practices and a course of business that operated as a fraud or

deceit upon BBB and others in connection with their purchases of BBB common stock during the Relevant Period.

137.     As a result of the Individual Defendants' misconduct, BBB has and will suffer damages in that it paid artificially inflated prices for BBB common stock purchased on the open market.  BBB would not have purchased BBB common stock at the prices it paid, had the market been aware that the market price of BBB's stock was artificially and falsely inflated by defendants' misleading statements.  As a direct and proximate result of these defendants' wrongful conduct, BBB suffered damages in connection with its purchases of BBB common stock during 2004 through 2006.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT IV

### Against All Defendants for Unjust Enrichment

138.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of BBB.  These wrongful acts included the approval of improperly backdated stock options by the Director Defendants as well as the receipt of undeserved compensation in connection with those options by the Officer Defendants.

140.     Plaintiff, as a shareholder and representative of BBB, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Approving Improperly Dated Stock Option Grants to BBB's Executive Officers

141.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.     The Individual Defendants owed and owe BBB fiduciary obligations.  By reason of

their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe BBB the highest obligation of good faith, fair dealing, loyalty and due care.

143.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

144.    Each of the Individual Defendants had actual or constructive knowledge that they had approved the improper backdating of stock option grants and the corresponding issuance of inaccurate financial results that did not properly account for the stock option grants and failed to correct or prevent these improprieties.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, BBB has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff on behalf of BBB has no adequate remedy at law.

## COUNT VI

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

147.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.    At the time of the stock sales as set forth herein, the Insider Selling Defendants knew the information described above, and sold BBB common stock on the basis of such information.

149.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold BBB common stock.

150.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated because of the undisclosed stock option and other related compensation expenses.  The Insider Selling Defendants' sales of BBB common stock while

in possession and control of this material adverse and non-public information was a breach of their fiduciary duties of loyalty and good faith.

151.　Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT VII

### Against All Defendants for Abuse of Control

152.　Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.　The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BBB, for which they are legally responsible.

154.　As a direct and proximate result of the Individual Defendants' abuse of control, BBB has sustained significant damages.

155.　As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.　Plaintiff on behalf of BBB has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Gross Mismanagement

157.　Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.　By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BBB in a manner consistent with the operations of a publicly held corporation.

159.　As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, BBB has sustained significant damages.

160.　As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

161.     Plaintiff on behalf of BBB has no adequate remedy at law.

## COUNT IX

### Against All Defendants for Waste of Corporate Assets

162.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.     As a result of the improprieties alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused BBB to waste valuable corporate assets and incur costs to conduct investigations, hire outside counsel, accounting firms and consultants, and to direct manpower to the task of restating BBB's past financials to correct for the improperly backdated stock option grants.

164.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

165.     Plaintiff on behalf of BBB has no adequate remedy at law.

## COUNT X

### Against All Defendants for an Accounting

166.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.     At all relevant times, the defendants, as directors and/or officers of BBB, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

168.     In breach of their fiduciary duties owed to BBB and its shareholders, the defendants authorized the granting of backdated BBB stock options to themselves and/or certain other BBB insiders.  By this wrongdoing, the defendants breached their fiduciary duties owed to BBB and its shareholders.

169.     The defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the defendants.

170.    As a result of defendants' misconduct, BBB has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

171.    Plaintiff demands an accounting be made of all stock options grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the defendants, as well as the disposition of any proceeds received by the defendants via sale or other exercise of backdated stock option grants received by the defendants.

## COUNT XI

### Against the Officer and Director Defendants for Rescission

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

173.    As a result of the acts alleged herein, the stock option contracts between the Officer and Director Defendants and BBB entered into during the relevant period were obtained through defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control. Further, the backdated stock options were illegal in that they were illegally backdated in violation of applicable federal and state law.  Moreover, defendants authorized these options in breach of the terms of the publicly filed employment agreements and the Company's stock option plans, which were also approved by BBB shareholders and filed with the SEC.  Consequently, the option grants are void.

174.    All contracts which provide for stock option grants between the Defendants and BBB and were entered into during times relevant hereto should, therefore, be rescinded, with all sums, proceeds and profits under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XII

## Against All Defendants for Constructive Trust

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

176.    As a result of the acts alleged herein, defendants authorized the grant of backdated or otherwise manipulated equity based compensation to themselves and other BBB insiders.  In effect, these backdated options and other manipulated equity or incentive based compensation constitutes illegal compensation in violation of BBB's stock option plans, employment contracts and other compensation polices.

177.    The Company has a right for the return of this compensation because it was illegally authorized by the defendants and paid out of the Company's assets.

178.    Defendants and other BBB insiders profited from the illegally backdated options by wrongful acts.

179.    Accordingly, plaintiff seeks a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants Temares, Eisenberg, Feinstein and Castanga are liable under §302 of the SOX, and requiring them to reimburse BBB for all bonuses or other incentive based or equity based compensation received by them during the period in which BBB will restate its financial results;

C.    Declaring and decreeing that the Director Defendants caused the Company to act in violation of §14(a) of the Exchange Act;

D.       Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder and awarding BBB damages;

E.       Directing BBB to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect BBB and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.       a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.       a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

3.       control and limit insider stock selling;

4.       a provision to permit the shareholders of BBB to nominate at least three candidates for election to the Board; and

5.       appropriately test and then strengthen the internal audit and control functions.

F.       Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding or otherwise restricting the proceeds of defendants' trading activities, backdated stock options or their other assets so as to assure that plaintiff on behalf of BBB has an effective remedy;

G.       Directing an accounting of all undisclosed backdated stock options granted, directing that all the unexercised options granted to defendants between 1993 and 2002 be cancelled, ordering the financial gains obtained via the exercise of such stock options returned to the Company, and ordering BBB to revise the Company's financial statements to reflect the truth concerning these option grants;

H.       Declaring that all stock options that were issued to defendants and illegally backdated are void and all proceeds from their exercise or sale are and have been held in constructive trust by defendants for the Company;

I.      Declaring that defendants' illicit and illegally obtained stock options, and all proceeds derived from the exercise thereof, and any assets or other property acquired in connection therewith, are and have been held in constructive trust by defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

J.      Awarding to BBB restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants through the improper backdating of stock option grants;

K.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

L.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 24, 2006                    KEARNEY & SCHWEITZER


_____/s/ Nancy L. Hart-Esposito_____
NANCY HART-ESPOSITO

210 White Horse Pike
P.O. Box 279
Haddon Heights, NJ 08035
Telephone: 856/547-7733
Facsimile: 856/546-5154

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
KELLY M. MCINTYRE
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3990

Attorneys for Plaintiff

G:\Cases\Bed Bath & Beyond\Complaints\Derivative\Crowley Der Cpt FINAL.doc